FILED

2009 Aug-14  AM 09:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **ANDREW COLVILLE and KAREN** | ] | |
| **COLVILLE,** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | **CV-05-BE-1979-E** |
| | ] | |
| **LOUIS LUCIANO DIVALENTIN;** | ] | |
| **ANNISTON MEDICAL CLINIC, P.C.;** | ] | |
| **and PAM CALDWELL,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

This case comes before the court on the Defendants' "Motion for Partial Summary Judgment" (doc. 127) and the Plaintiffs' "Motion for Partial Summary Judgment" (doc. 128). The parties have fully briefed both motions. Plaintiffs claim, *inter alia*, that the Defendants' treatment of Plaintiff Andrew Colville was inadequate in violation of the Eighth Amendment and the Alabama Medical Liability Act, causing them injury and loss of consortium. The Defendants – Dr. Louis DiValentin, Medical Assistant Pam Caldwell, and the Anniston Medical Clinic – assert that the Plaintiffs have failed to put forth the requisite evidence to support those claims. For the reasons stated below, the court will GRANT IN PART, as to Defendant Caldwell's motion for summary judgment on the medical malpractice claim and as to the Clinic's motion for summary judgment on the Eighth Amendment claim; DENY IN PART the Defendants' motion for partial summary judgment as to all other claims (doc. 127); and DENY the Plaintiffs' motion for partial summary judgment (doc. 128).

This case also comes before the court on Defendants' "Motion to Strike Supporting

Exhibits to Plaintiff's [sic] Motion for Partial Summary Judgment" (doc. 135); Defendants'

"Motion to Strike Supporting Exhibits to Plaintiff's [sic] Opposition to Defendants' Motion for

Partial Summary Judgment" (doc. 139); and Plaintiffs' "Motion to Strike" (doc. 146). For the

reasons stated below, the court will GRANT IN PART, as to the ABI reports not accompanied by

sworn declarations, and DENY IN PART, as to those ABI reports accompanied by sworn

declarations, the Defendants' motions to strike (docs. 135 & 139). The court will DENY the

Plaintiffs' motion to strike (doc. 146).

The court will enter a separate order simultaneously.

## FACTS[1]

Plaintiff Andrew Colville was incarcerated at the Cleburne County Jail in December of

2004. He was involved in a fight with another inmate a little after 11:00 a.m. on December 4,

2004. To break up the fight, a corrections officer tasered Mr. Colville. After being tasered, Mr.

Colville fell and struck his head on either the wall or the floor. Other inmates saw a knot on the

back of Mr. Colville's head and heard him complaint that he was dizzy. After he was tased, he

also complained of a headache and required ice packs. Once the fight had ended, Randy Wilson

and another fellow inmate helped Mr. Colville into the isolation cell, where he stayed until the

afternoon of December 7, when he returned to his usual cell on the D-Pod.

During the relevant time period, Defendant Dr. DiValentin had a contract to provide

medical services to inmates at the jail. Defendant Pam Caldwell was assigned by Dr. DiValentin

---

[1] The court has gleaned these facts from the parties' statements of undisputed facts, briefs, and evidentiary submissions. "[T]hese are the facts for summary judgment purposes only. They may not be the actual facts." *Richardson v. Honda Mfg. of Ala., LLC*, --- F. Supp. 2d ----, 2009 WL 2171113, at *2 n.4 (N.D. Ala. July 22, 2009) (citing *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)).

to respond to calls from the jail for emergency medical assistance at times when neither she nor Dr. DiValentin were scheduled to go to the jail. Jail personnel believed Caldwell was a nurse. Caldwell described herself as "the nurse that went to the jail," despite the fact that her position with the Anniston Medical Clinic was that of medical assistant and office manager. Caldwell did not graduate high school and her only medical training prior to her employment with Anniston Medical Clinic was a two-day medical assistant course. All she recalls learning in the course was how to check blood pressure and take a pulse. Plaintiffs assert that Caldwell does not have the requisite skill or training to prepare treatment notes.

On December 4, 2004, jail personnel called Caldwell to report that Mr. Colville had been in an altercation with another inmate, that he had fallen and hit his head, and that he needed to be seen.[2] Caldwell notified Dr. DiValentin about the phone call, received instructions from him, and went to the jail to see Mr. Colville. Caldwell's custom and practice when going to see patients at the jail was to notify Dr. DiValentin, receive instructions, visit the patient, then report her observations to Dr. DiValentin and receive any further instructions.

When Caldwell first saw Mr. Colville on December 4, 2004, she asked him about the altercation, and he complained only of a laceration on his jaw. She determined that he was "oriented times four" and his eyes were equal and reactive to light. She observed that he had a normal gait and a normal range of motion. She also examined his head and found no boney deformities or bruising.

---

[2] Caldwell visited Mr. Colville four times, on December 4, 5, 7, and 8, 2004. Dr. DiValentin only saw Mr. Colville once, on December 7, 2004. Except for the notes of December 7, all the notes from medical visits to Mr. Colville while he was at the jail were based upon Defendant Pam Caldwell's reports.

Correctional Officer Funderburk called Dr. DiValentin on December 5, 2004, to tell Dr. DiValentin that Mr. Colville was complaining that he was dizzy and that his head hurt. Again, Defendant Caldwell visited the jail to see Mr. Colville. When Caldwell saw Mr. Colville on December 5, she determined he was "oriented times one," which Plaintiffs assert indicates a rapid deterioration in Mr. Colville's condition from December 4 to December 5. Caldwell also noted that Mr. Colville was "selective in his reasoning." Dr. DiValentin stated that "selective in his reasoning" means that the patient chose not to respond to every question Caldwell asked. Defendants assert, therefore, that Mr. Colville's "deterioration" from oriented "times four" to oriented "times one" was a result of his failure to cooperate with Caldwell's examination.

When Caldwell visited Mr. Colville on December 7, she was unable to arouse him. Dr. DiValentin instructed her to attempt a sternal rub if Mr. Colville was unresponsive. A sternal rub is a painful technique of applying the knuckle forcefully to the sternum on patients who are unconscious or comatose to determine how deeply unconscious they are and to try and obtain a responsive reaction. Caldwell performed the sternal rub,[3] but she still was unable to awaken him.

Because Caldwell could not arouse Mr. Colville, she went back to the Anniston Medical Clinic to report to Dr. DiValentin. Dr. DiValentin then accompanied her back to the jail to see Mr. Colville for the first time. Dr. DiValentin was able to arouse Mr. Colville from his somnolent, or sleepy, state with a sternal rub.  Dr. DiValentin did not notice any contusion on Mr. Colville's head at that time. After his evaluation of Mr. Colville on December 7, Dr. DiValentin noted that Mr. Colville should be checked the next day and, "if still somnolent,"

---

[3] Caldwell stated that after watching Dr. DiValentin perform the sternal rub, she realized she had done it incorrectly. She had never performed a sternal rub before she attempted one on Mr. Colville, and she said she had not done it hard enough in attempting to arouse Mr. Colville.

unresponsive, or not moving around, referred for a CT scan for a possible subdural hematoma.[4]

During the December 7 visit from Dr. DiValentin and Caldwell, inmate Jerry Johnson reportedly asked them about the knot on Mr. Colville's head. Johnson said he was told that nothing was wrong with Mr. Colville and that he was "pulling the wool over your eyes." When Dr. DiValentin and Caldwell left, jail personnel permitted Johnson and Studdard to move Mr. Colville back to his normal cell on D-Pod.

Johnson also tried to get Mr. Colville's home phone number so he could contact Mr. Colville's wife about the situation. Mr. Colville could not remember the number, so Johnson asked jail chaplain John Childs to call Mr. Colville's wife. Childs wanted to visit Mr. Colville before he called her. Childs visited Mr. Colville on December 8, noted the knot on his head and the weakness on the right side of his body, and asked Johnson to update him as to Mr. Colville's condition later that evening.

Despite noting that Mr. Colville should be checked the next day, Dr. DiValentin did not visit Mr. Colville on December 8. Instead, Caldwell visited Mr. Colville. Mr. Colville stated that he was "alright" and "more better" at that time. However, Correctional Officer Funderburk noted that Mr. Colville was wobbly, and Caldwell dismissed the wobbliness with a "never mind." Defendants assert that Mr. Colville only began to wobble when he realized that Caldwell was there to check on him.

When Mr. Colville returned to D-Pod, his fellow inmates noted that he was not eating, was acting differently, had bruises on his head and elbows, and had a large knot on the back of

---

[4] A subdural hematoma is a traumatic brain injury in which blood gathers beneath the outer protective covering of the brain.

his head. Additionally, Mr. Colville could not care for himself or go to the bathroom without

assistance. Mr. Colville soiled himself several times, and fellow inmates Studdard and Johnson

helped bathe him twice. Mr. Colville also reported an inability to use his right arm or right leg.

On December 9, Mr. Colville tottered in his cell and hit his head on his bed frame, which

caused a laceration and bruise above his right eye. Sometime between December 8 and December

10, 2004, the jail requested, and at some point thereafter received, a letter from Dr. DiValentin

stating that Mr. Colville required further medical attention to facilitate his transfer to the state

penal system.

Cleburne County Jail personnel transported Mr. Colville to the Kilby Correctional

Facility, a state penal facility, early in the morning on December 10, 2004. The officers had to

put towels and plastic on the patrol car seats, because Mr. Colville continued to soil himself.

Jailer Jeff Parker thought that the inmates in D-Pod had given Mr. Colville a liquid laxative,

which was making Mr. Colville lose control of his bowels.

When Mr. Colville arrived at the Kilby Facility gate, the officer at the gate called for

immediate medical assistance. Mr. Colville was taken to Baptist Medical Center in Montgomery,

Alabama, where he was diagnosed with an epidural hematoma and underwent emergency surgery

for a skull fracture and the epidural hematoma.[5]

## STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary

judgment allows a trial court to decide cases when no genuine issues of material fact are present

---

[5] An epidural hematoma is a traumatic brain injury in which a buildup of blood occurs
between the outer membrane of the brain and the skull.

6

and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact *or* by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue [of material fact].'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In responding to a motion for summary judgment, the non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material fact." *Matsushita*, 475 U.S. at 586.

The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a *genuine issue [of material fact]*.'" *Celotex*, 477 U.S. at 324 (quoting Fed.

R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of

Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to

pierce the pleadings and to assess the proof in order to see whether there is a genuine [issue of

material fact]."). If the evidence is "merely colorable, or is not significantly probative, summary

judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

 In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which the trier of fact could reasonably find for the

nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575

(11th Cir. 1988). Furthermore, all evidence and inferences drawn from the underlying facts must

be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The

non-moving party "need not be given the benefit of every inference but only of every reasonable

inference." *Id.* Instead, the evidence of the non-moving party "is to be believed and all

justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both

parties have addressed the motion for summary judgment, the court must grant the motion *if* no

genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56.

 The applicable Rule 56 standard is not affected by the filing of cross motions for

summary judgment. *See, e.g., United States v. Oakley*, 744 F.2d 1553, at 1555-56 (11th Cir.

1984). When parties file cross motions for summary judgment, "each side must still establish the

lack of genuine issues of material fact and that it is entitled to judgment as a matter of law."

*Busby v. JRHBW Realty, Inc.*, --- F. Supp. 2d ----, 2009 WL 1181902, at *4 (N.D. Ala. 2009).

"The fact that both parties simultaneously are arguing that there is no genuine issue of fact . . .

does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it

sees fit." *Id.* (internal quotation marks omitted). The Eleventh Circuit has noted that "[c]ross

motions for summary judgment will not, in themselves, warrant the court in granting summary

judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not

genuinely disputed." *Oakley*, 744 F.2d at 1555. Nevertheless, "cross-motions may be probative of

the non-existence of a factual dispute when . . . they demonstrate a basic agreement concerning

what legal theories and material facts are dispositive." *Id.* at 1555-56.

## DISCUSSION

In their motion for summary judgment, Plaintiffs assert that the lack of qualified and

appropriate medical treatment resulted in an Eighth Amendment violation. Plaintiffs also argue

that the medical treatment Mr. Colville received from the Defendants fell below the relevant

standard of care in violation of the Alabama Medical Liability Act (AMLA). *See* Ala. Code § 6-

5-540, *et seq.*   In their motion for summary judgment, Defendants assert that the malpractice

claim against Defendant Pam Caldwell fails, because the Plaintiffs have not carried their burden

of proving the claim by expert testimony. The Defendants also argue that the Eighth Amendment

claim fails, because the Plaintiffs' evidence is deficient. The Defendants also argue that any

claims against the Anniston Medical Clinic that are based on a theory of respondeat superior fail

as a matter of law.

**I.      Eighth Amendment Claim**[6]

Mr. Colville first asserts that the Defendants violated his Eighth Amendment right not to be subjected to cruel and unusual punishment. Established law[7] states that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citations and footnotes omitted). A prisoner can state a valid claim under the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs . . . or by prison guards in intentionally denying or delaying access to medical care . . . or intentionally interfering with treatment once prescribed." *Id.* at 104-05.

To establish a claim under the Eighth Amendment, "a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). "First, the plaintiff must prove an objectively serious medical need. Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (internal citations omitted).

---

[6] The Eighth Amendment claim is Count One of the Plaintiffs' Third Amended Complaint (doc. 123).

[7] Claims of deliberate indifference to the serious medical needs of convicted prisoners are governed by the Eighth Amendment. The Fourteenth Amendment governs similar claims brought by pretrial detainees. The Eleventh Circuit has "held that the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner." *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997). As such, the court will analyze Mr. Colville's claim under the decisional law of both amendments. *Cf. Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007) (analyzing a pre-trial detainee's claim under the decisional law of both the Fourteenth and Eighth Amendments).

### A.      Objective Inquiry

"[A] serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Farrow*, 320 F.3d at 1243 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). The Defendants do not dispute Mr. Colville's argument that he had an objectively serious medical need, nor do they even address this first element of Mr. Colville's Eighth Amendment claim. As such, the court concludes that the Defendants have conceded, at least for summary judgment purposes, that Mr. Colville had an objectively serious medical need, and will turn immediately to analysis of the second element of that claim.

### B.      Subjective Inquiry

To establish the second element, deliberate indifference to the serious medical need, a plaintiff "must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown*, 387 F.3d at 1351 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of [cruel and unusual] punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). "It is obduracy and wantonness, not inadvertence or error in good faith," that violate the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 1.      Subjective Knowledge of a Risk of Serious Harm

Mr. Colville first asserts that the Defendants subjectively knew of the risk of serious

11

harm. Defendants, in their statement of undisputed facts, assert that jail personnel called

Defendants on December 4, 2004, to request that Mr. Colville be seen, because he had fallen and

hit his head. Upon examination by Caldwell, Defendants assert that Mr. Colville was

neurologically intact and showed no signs of head trauma. Mr. Colville asserts that his head

trauma was so obvious that other inmates recognized the lump on his head and his deteriorating

behavior. However, Defendants' medical notes do not report that Mr. Colville ever complained

of headaches, pain, or other symptoms consistent with a head trauma. Furthermore, Defendant

Caldwell specifically examined Mr. Colville's skull on December 4 and noted that he had no

boney deformities or bruising. Not until December 7, when Dr. DiValentin had to utilize a sternal

rub to awaken Mr. Colville, did Defendants consider the possible seriousness of Mr. Colville's

head condition. On December 7, Dr. DiValentin instructed Defendant Caldwell to examine Mr.

Colville the next day, at which point if Mr. Colville was still somnolent he might consider a CT

scan to rule out a subdural hematoma.

If at no point before then, Defendants subjectively knew of the risk of serious harm on

December 7, when Dr. DiValentin had to awaken Mr. Colville with a sternal rub and began

wondering if Mr. Colville might have a hematoma. As such, for the purpose of summary

judgment, Mr. Colville has established the first subpart of the "deliberate indifference" element

of his Eighth Amendment claim.

### 2.     *Disregard of that Risk*

Mr. Colville asserts that Defendants disregarded the risk of serious harm to him. Mr.

Colville first asserts that Dr. DiValentin disregarded the risk of serious harm by sending

Defendant Caldwell to examine Mr. Colville after jail personnel notified Defendants that Mr.

Colville had hit his head. "'Deliberate indifference to serious medical needs is shown . . . when an inmate is denied access to medical personnel capable of evaluating the need for treatment.'" *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (quoting *Ramos v. Lam*, 639 F.2d 559, 575 (10th Cir. 1980)). "Deliberate indifference to serious medical needs may [also] be shown by proving a policy of deficiencies in staffing or procedures such that the inmate is effectively denied access to adequate medical care." *Anderson v. City of Atlanta*, 778 F.2d 678, 686 n.12 (11th Cir. 1985).

Mr. Colville argues that by allowing Defendant Caldwell, whom jail personnel *thought* was a nurse but who in actuality only had two days of formal training as a medical assistant, to examine and care for him, Defendants effectively denied him access to adequate medical personnel capable of evaluating his need for treatment. Mr. Colville's expert, Dr. Philbrick, opined that Dr. DiValentin's use of Pam Caldwell to examine Mr. Colville and monitor his condition fell below the standard of care.[8] The Defendants' expert, Dr. Lyrene, expressed the opinion that Dr. DiValentin acted within the standard of care in utilizing Pam Caldwell to evaluate Mr. Colville and report to him her observations. The Defendants also argue that their observations of Mr. Colville indicated that he was neurologically intact[9] with no bone deformities or bruising, and somnolent on only one occasion. The Defendants further argue that jail

---

[8] The standard of care is not the sole standard by which deliberate indifference claims are judged. However, if the Defendants acted in conformity with the relevant standard of care, and with no "attitude of deliberate indifference," Mr. Colville's Eighth Amendment claims will fail. *See Redd v. Conway*, 160 Fed. App'x 858, 860 (11th Cir. 2005).

[9] The court questions how a person with two days of medical training can effectively determine whether someone is "neurologically intact," but weighing the credibility of evidence remains the province of the jury.

personnel, whom they assumed were monitoring Mr. Colville, never informed them of any deterioration in Mr. Colville's condition.

The court finds that genuine issues of material fact remain as to the second subpart of the "deliberate indifference" claim. As such the court cannot reach the question of whether either party is entitled to judgment as a matter of law on the Mr. Colville's Eighth Amendment claims.

### 3.   *More than Merely Negligent Conduct* [10]

Mr. Colville asserts that the Defendants' actions amounted to more than merely negligent conduct. Mr. Colville argues, and Mr. Colville's expert opines, that Defendants assumed he was faking his symptoms and complaints, and as a result, overlooked clear signs of head trauma. Mr. Colville's expert stated that doctors should evaluate patients with an open mind, and not let assumptions cloud their judgment or observations. Mr. Colville also asserts that Pam Caldwell observed him wobble from dizziness, but deliberately dismissed that observation with a "never mind." Mr. Colville also asserts that Dr. DiValentin's failure to order a CT scan when Dr. DiValentin observed him in a somnolent state, which did cause Dr. DiValentin to suspect a subdural hematoma, amounted to more than merely negligent conduct.

The Defendants argue that they did not know of Mr. Colville's allegedly deteriorating condition, did not observe any neurological deficits, and did not note any visible signs of head trauma. The Defendants note that "an official's failure to alleviate a significant risk that he *should have* perceived but did not, while no cause for commendation, cannot under our cases be

---

[10] Though the court has already determined that factual issues remain as to the Eighth Amendment claims, the court will continue the analysis of the third subpart of the "deliberate indifference" element. Factual issues remain as to the third subpart as well, bolstering the court's decision not to grant either party judgment as a matter of law on the Eighth Amendment claims.

condemned as the inflection of [cruel and unusual] punishment." *Farmer*, 511 U.S. at 838 (emphasis added).

The Plaintiffs have established that the Defendants sent Caldwell, who barely had any medical training, to evaluate Mr. Colville when jail personnel reported that he had fallen and hit his head, and that the Defendants observed Mr. Colville in a somnolent state three days after the reported head injury, which caused Dr. DiValentin to suspect a subdural hematoma. Plaintiffs have also established that the Defendants did not immediately order a CT scan or other test to determine the extent of any possible head trauma. Genuine issues of material fact remain, however, as to whether the Defendants acted in a deliberately indifferent manner in deciding to wait another day before considering the ordering of a CT scan.

Furthermore, while the court notes that the Plaintiffs may have established that Defendants *should have* perceived Mr. Colville's neurological deterioration and his allegedly obvious lump on his head, the court finds that genuine issues of material fact remain as to whether Defendants *deliberately* acted in a manner that constitutes *more than merely negligent* conduct.

As such, the court concludes that neither party is entitled to judgment as a matter of law as to the Eighth Amendment claims, because genuine issues of material fact remain.

C.    *Respondeat Superior Claims against the Anniston Medical Clinic*

The Defendants also argue that the deliberate indifference claims against the Anniston Medical Clinic must be dismissed, because a theory of respondeat superior is not sufficient to support such a claim. "[T]o prove that [an employer] should be liable, the plaintiffs would have to demonstrate that [the employer] itself directly caused the violation of their constitutional rights

through their adoption of some official policy or practice." *Edwards v. Ala. Dept. of Corr.*, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 695 (1978); *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1502-03 (11th Cir. 1985)). When a private entity "contracts with a state to perform a function traditionally within the province of the state government, including the provision of medical services to state inmates, then that [entity] should be treated as a government entity and as a person acting under color of state law within the meaning of § 1983." *Edwards*, 81 F. Supp. 2d at 1254 (citing *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997); *Howell v. Evans*, 992 F.2d 712, 724 (11th Cir. 1991)).

Plaintiffs concede that Dr. DiValentin, not the Clinic, had the contract to provide medical services to inmates at the jail. Dr. DiValentin and Pam Caldwell stated that *their* custom or practice, not the *Clinic's*, regarding providing medical services to the jail involved Caldwell seeing inmates when Dr. DiValentin was unavailable, and reporting her observations and receiving instructions from him.

The court finds that the Plaintiffs have failed to provide sufficient evidence that the Clinic should be held liable on the Eighth Amendment claims. As such, the court will dismiss the Eighth Amendment claims against the Clinic.

## II.    Medical Malpractice Claim[11]

Mr. Colville asserts that he is entitled to judgment as a matter of law on the state law malpractice claims. Under the AMLA, a "plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence

---

[11] The AMLA claim is Count Two of the Plaintiffs' Third Amended Complaint (doc. 123).

as other similarly situated health care providers in the same general line of practice ordinarily

have and exercise in a like case." Ala. Code § 6-5-548. To prevail on a medical malpractice

claim, "the plaintiff ordinarily must present expert testimony from a similarly situated health-care

provider as to (1) the appropriate standard of care, (2) a deviation from that standard of care, and

(3) a proximate causal connection between the act or omission constituting the breach and the

injury sustained by the plaintiff." *Lyons v. Walker Reg. Med. Ctr.*, 791 So. 2d 937, 942 (Ala.

2000) (internal quotation marks and alterations omitted).

      A.     *Expert Testimony as to Defendant Caldwell*

      In response, the Defendants first argue that the malpractice claims against Defendant Pam

Caldwell[12] must fail as a matter of law, because the Plaintiffs have not presented expert

testimony as to the appropriate standard of care for Defendant Caldwell. Both parties

acknowledge that lay persons can properly *monitor* head trauma victims *with adequate

instruction*. As such, Plaintiffs assert that expert testimony is not required, because Defendant

Caldwell is in effect a layperson and that her alleged errors are apparent to laypersons without the

need for expert testimony. Plaintiffs also assert that even if expert testimony is necessary, their

medical expert Dr. Philbrick is competent to give and has given such expert testimony as to

Defendant Caldwell. However, the Plaintiffs are not merely asserting Caldwell's medically

negligent *monitoring*, but also her negligent failure to *detect* the head trauma and/or receive

*adequate instruction* from Dr. DiValentin.

---

      [12] Pam Caldwell, as a medical assistant, falls within the definition of a "health care provider" as defined by the AMLA. Ala. Code §§ 6-5-481 & 6-5-542. As such, the malpractice claims against Defendant Caldwell are governed by the AMLA, just as the malpractice claims against Dr. DiValentin and the Clinic, also "health care providers," are governed by the AMLA.

"In a medical-malpractice action, the plaintiff ordinarily is required to present expert testimony as to the relevant standard of care." *Martin v. Dyas*, 896 So. 2d 436, 441 (Ala. 2004). "A plaintiff in a medical-malpractice action must also present expert testimony establishing a causal connection between the defendant's act or omission constituting the alleged breach and the injury suffered by the plaintiff." *Sorrell v. King*, 946 So. 2d 854, 862 (Ala. 2006). "However, an exception to this rule requiring expert testimony exists in a case where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it." *Tuscaloosa Orthopedic Appliance Co. v. Wyatt*, 460 So. 2d 156, 161 (Ala. 1984) (internal quotation marks omitted). The following situations are generally recognized as falling within this exception:

> 1) where a foreign instrumentality is found in the plaintiff's body following surgery; 2) where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment; 3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice; and 4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor's allegedly negligent conduct.

*Allred v. Shirley*, 598 So. 2d 1347, 1350 (Ala. 1992) (internal quotation marks omitted).

This case does not fall within any of the situations generally recognized as needing no expert testimony. Accordingly, the Plaintiffs were required to present expert testimony from a "similarly situated health care provider." *See* Ala. Code § 6-5-548(e).

The question for the *medical malpractice* claim is whether Defendant Caldwell breached the standard of care for medical assistants in observing patients; reporting her observations to the supervising physician; and by her alleged ignorance or failure to notice the supposedly obvious lump on Mr. Colville's head, deterioration of his condition, and signs of neurological deficits.

Plaintiffs' expert, Dr. Philbrick, is a physician, not a medical assistant. The court finds[13] that Dr. Philbrick is not a "similarly situated health care provider," and under Alabama law is not competent to provide expert testimony as to the relevant standard of care and alleged breach by medical assistant Pam Caldwell. *See Estate of Bradley v. Mariner Health, Inc.*, 315 F. Supp. 2d 1190, 1195-96 (S.D. Ala. 2004) (finding that a nurse practitioner and a physician were not similarly situated to defendants who provided hands on nursing care ); *Anderson v. Ala. Reference Labs.*, 778 So. 2d 806, 811-12 (Ala. 2000) (finding that a physician with no training or experience in the field of tuberculosis testing was not similarly situated to a defendant who was a certified medical technologist who regularly performed tuberculosis testing)*; Husby v. S. Ala. Nursing Home, Inc.*, 712 So. 2d 750, 753 (Ala. 1998) (finding that an anesthesiologist and a nursing home administrator were not similarly situated to defendants who provided hands on nursing care).

The court, therefore, finds that the AMLA claims against Defendant Pam Caldwell are due to be dismissed, because the Plaintiffs have not presented sufficient expert evidence to sustain such a claim against her.[14]

---

[13] "The question whether a witness is qualified to give an expert opinion is customarily left to the discretion of the trial court, and the trial court's determination will not be disturbed on appeal absent a finding of abuse of discretion." *Husby*, 712 So. 2d at 753 (citing *Bell v. Hart*, 516 So. 2d 562, 569 (Ala. 1987)).

[14] Because the AMLA claims against Pam Caldwell will be dismissed for lack of sufficient evidence, the court does not reach the question of her liability under the AMLA, if any. As such, to the extent that the Plaintiffs' AMLA claims against the remaining Defendants are predicated on a theory of vicarious liability, those claims may still proceed without Defendant Caldwell. The Plaintiffs' AMLA claims against the remaining Defendants predicated on a straight theory of those Defendants' own negligence, obviously, may also still proceed.

B.      *AMLA Claims as to Other Defendants*

In their motion for summary judgment, Mr. Colville asserts that he is entitled to judgment as a matter of law on the AMLA claims as to all the Defendants. The court is dismissing the AMLA claims against Defendant Caldwell, so only the AMLA claims remaining against Dr. DiValentin and the Clinic will be considered.

The Plaintiffs have provided expert testimony from a similarly situated health care provider regarding the relevant standard of care for the two remaining AMLA Defendants. Plaintiffs' expert Dr. Philbrick opined that the Defendants breached the relevant standard of care in treating Plaintiff. Defendants' expert Dr. Lyrene opined that the Defendants acted within the relevant standard of medical care. At the summary judgment stage, the court is not able to weigh the competing expert opinions.

Because genuine issues of material fact reserved for a jury remain, the court cannot enter judgment as a matter of law for either party as to the AMLA claims.

**III.    Defendants' Motions to Strike**

The Defendants move the court to strike exhibits submitted by the Plaintiffs in support of the Plaintiffs' motion for partial summary judgment (doc. 135) and in support of the Plaintiffs' opposition to the Defendants' motion for partial summary judgment (doc. 139). The two motions seek to strike the same evidence: ABI Investigative Reports prepared during the course of the ABI investigation into the events surrounding Mr. Colville's injury at the jail. (Pls.' Exs. A-O). The Defendants argue that the witness statements contained in the ABI reports are hearsay and unauthenticated, and thus are inadmissible for consideration on summary judgment. For the reasons stated below, the court will grant in part and deny in part the Defendants' motions to

strike (docs. 135 & 139).

The Plaintiffs have supplemented their evidentiary submissions to include sworn affidavits from six of the thirteen witnesses investigated by the ABI. The sworn affidavits state that the witness observed the events involving Plaintiff Colville at the Cleburne County Jail on December 4, 2004; that the witness gave a statement to the Alabama Bureau of Investigation concerning what he or she witnessed; that the ABI report accurately reflected what the witness had told the ABI investigator; and that the ABI report accurately reflected what the witness observed.

Defendants cite *Brewer v. City of Daphne*, 111 F. Supp. 2d 1299, 1304 (S.D. Ala. 1999), in support of their motion to strike. In *Brewer*, the Southern District of Alabama found inadmissible the unsworn statements made by inmates and jailers to an ABI investigator during the course of a routine investigation after an inmate's suicide. 111 F. Supp. 2d at 1304. Though *Brewer* is not binding upon this court, the court does find its rationale instructive. As such, the court will strike those ABI reports not accompanied by sworn declarations made by the witness interviewed in the ABI report. (Pls.' Exs. B, C, E, F, G, I, K).

However, here, some of the witnesses interviewed by the ABI investigator *have* signed sworn declarations that the ABI report accurately reflects not only what the witness told the ABI investigator (which may still fall vulnerable to attack under the Defendants' hearsay arguments), but also that the ABI report accurately reflected what the witness observed. *See* Fed. R. Civ. P. 56(e) (stating that a sworn affidavit may refer to another paper and a certified or sworn copy of that paper must be attached to the affidavit). The court finds that the ABI reports accompanied by sworn declarations of the witnesses interviewed in those ABI reports may be considered for the

purposes of summary judgment. (Pls.' Exs. D, H, J, L, M, N).

## IV.    **Plaintiffs' Motions to Strike**

The Plaintiffs move the court to strike the Defendants' supplemental response in opposition to the Plaintiffs' motion for partial summary judgment (doc. 146). The Plaintiffs move to strike the Defendants' supplemental response, which adds a discussion of those facts stated by the Plaintiffs that the Defendants dispute. The Plaintiff is correct that, pursuant to Appendix II, a response to a motion for summary judgment should include any disputes with the stated facts. The Defendants' supplemental response includes the Defendants' disputes with the facts as stated in the Plaintiffs' brief in support of summary judgment. The supplemental responses are mostly composed of statements of facts from the Defendants' point of view that were already stated among the many briefs submitted on these cross motions for summary judgment. As such, the Plaintiffs are not prejudiced by allowing the supplemental responses.

Though the Defendants did not technically adhere to the mandates of Appendix II, the court sees no prejudice in allowing the supplemental responses. Just as the court allowed the Plaintiffs to supplement their evidentiary submissions with sworn declarations of the ABI interviewed witnesses, so will the court allow the Defendants to supplement their response to include specific factual disputes.

The court, therefore, will deny the Plaintiffs' motion to strike (doc. 146).

## CONCLUSION

Based on the foregoing reasons, the court will GRANT IN PART and DENY IN PART the Defendants' motion for partial summary judgment (doc. 127), and DENY the Plaintiffs' motion for partial summary judgment (doc. 128).

Specifically, the court will GRANT the Defendants' motion for partial summary judgment as to the Eighth Amendment claim against the Anniston Medical Clinic, because the Plaintiff failed to provide sufficient evidence as to that claim. The court, therefore, will DISMISS the Plaintiffs' Eighth Amendment claim as to the Clinic.

The court will also GRANT the Defendants' motion for partial summary judgment as to the medical malpractice claim against Defendant Pam Caldwell, because the Plaintiffs' failed to provide sufficient evidence as to that claim. As such, the court will DISMISS the Plaintiffs' medical malpractice claim against Defendant Pam Caldwell.

As to all other claims raised on summary judgment, the court finds that neither party is entitled to judgment as a matter of law, because genuine issues of material fact remain. Combined with the claims not addressed on summary judgment, the claims that will proceed are the Plaintiffs' Eighth Amendment claim against Pam Caldwell and Dr. DiValentin; Plaintiffs' AMLA claim against Dr. DiValentin and the Clinic; Plaintiffs' negligence and wantonness claims against Pam Caldwell; and Plaintiffs' loss of consortium claim against all Defendants.

As for the parties' motions to strike, the court will GRANT IN PART and DENY IN PART the Defendants' motions to strike (docs. 135 & 139), and DENY the Plaintiffs' motion to strike (doc. 146).

DATED this 13th day of August, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE